UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COEXIST FOUNDATION, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 11-cv-6279 |
| | ) |
| MICHAEL FEHRENBACHER, UNITED | ) Judge Sharon Johnson Coleman |
| FUNDING, INC., MWF FINANCIAL & | ) |
| MORTGAGE CENTER, INC., and | ) |
| MIDWEST FUNDING BANKCORP, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Coexist Foundation, Inc. ("Coexist") filed an eleven-count complaint against Michael Fehrenbacher and two companies he owns: United Funding, Inc. and MWF Financial & Mortgage Center d/b/a Midwest Funding Bankcorp. Five counts were disposed of in pre-trial proceedings. The Court then held a bench trial on March 14 and 16, 2016 on the remaining claims for breach of contract, civil theft, fraudulent transfer of assets, and violations of Florida securities law. At the close of Coexist's case-in-chief, defendants (hereinafter "Fehrenbacher") moved for a directed verdict on all claims, which the Court took under advisement. Following the bench trial, the Court accepted a response and reply to the motion for directed verdict and the parties submitted post-trial briefs. The Court finds for Coexist on its claim for the sale of unregistered securities in violation of Fla. Stat. §517.07 (Count VII) and grants Fehrenbacher's motion for directed verdict on all other counts.

**Background**

The following constitutes the Court's findings of fact pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

The president of Coexist, Timothy Hubman, admits he used to be "a con man" but testified that he stopped being one when he "joined the church" in 2008. (Dkt. 202 at 58.) From 2005 to 2008 Hubman was the sole director and president of the Hubman Foundation. (*Id.*) In August 2006, a federal district court in the Western District of Virginia found that the Hubman Foundation was not acting as a charitable organization but was instead a "sham designed to try to insulate Hubman . . . from [his] debts and obligations." (Defs. Ex. 12 at 5.) In 2008, the same day Hubman dissolved the Hubman Foundation, he became "[p]resident, sole director, and all officers" of Coexist. (Dkt. 202 at 16, 73.)

Hubman and Fehrenbacher were first introduced to one another by a mutual contact in early 2009. (Id. at 16-17; Dkt. 203 at 65.) Fehrenbacher was president of MWF Financial, a wholesale banking institution that "packaged" and sold mortgage notes to investment banks, and United Funding, a retail loan broker. (Dkt. 203 at 64-65.) He became interested in developing a relationship with Hubman because Hubman claimed to have contacts that could be potential clients for Fehrenbacher. (*Id.* at 65.) After their initial meeting, Hubman sent Fehrenbacher an email on March 16, 2009 asking Fehrenbacher to send him "the escrow doc" and mentioning that Hubman had "a friend who has a credit line for big money." (Pl's Ex. 21 at 2.) Hubman concluded the email by stating "I hope we do business for a long time and the numbers you referenced really materialize." (*Id.*) Fehrenbacher's response to the email included two attachments, entitled "UF.EscrowDisbursementAgreement2" and "UF.WireInstructions." (Id. at 1.) Fehrenbacher also provided information on the process for some type of transaction between Fehrenbacher and Hubman's friend. (*Id.*) Fehrenbacher concluded the email by telling Hubman "you will be happy with the programs I have." (*Id.*)

Fehrenbacher testified that the friend of Hubman's referenced in the March 16 emails was a man by the name of Chip Drury who was looking to take out a $25 million loan for trading purposes.

2

(Dkt. 203 at 7, 43.) Fehrenbacher further testified that Hubman's request for "the escrow doc" was a request for an escrow agreement to provide to Drury. (*Id.* at 7.) According to Fehrenbacher, the loan to Drury never materialized. (*Id.* at 44.) However, Fehrenbacher and Hubman continued to engage in a business relationship, working on "a lot of transactions" and making "tons of great deals." (Dkt. 202 at 144, Dkt. 203 at 14.)

On March 31, Fehrenbacher sent Hubman an email to inform him that "this is the most opportune time to place your funds into trade." (Pl's Ex. 21 at 3.) He also told Hubman "I can place your funds in with the others and you will receive the same benefit as the other investment." (*Id.*) He promised Hubman that "the funds stay in my escrow account – 100% safety." (*Id.*) The email also provided that "the escrow forms and wire instructions" were attached, but the printout of the email contains no indication that documents were attached. (*Id.*) In April 2009, Coexist wired $300,000.00 to an account at Harris Bank in Palatine, Illinois, belonging to Fehrenbacher. (Dkt. 202 at 20; Pl's Ex. 1.) Hubman soon thereafter requested a return of $150,000.00 and Fehrenbacher complied. (Dkt. 202 at 20.) Fehrenbacher testified that Coexist deposited these funds (netting out to $150,000.00) for a "MT760 trade with Harris Bank" that "never happened." (Dkt. 203 at 44-45.) Rather than the money being used for a trade, it "just sat there in . . . escrow." (*Id.*)

However, on June 3, Fehrenbacher sent Hubman an email stating that the $150,000.00 was part of a "placement" set with "the trader" which would produce a return of twenty-five percent (Coexist would receive fifteen percent), every 10 days. (Pl's Ex. 21 at 6.) The email also mentioned the possibility of Coexist wiring to Fehrenbacher an additional $1.85 million to be part of the "placement" with "the trader." (*Id.*) Later that month Coexist did in fact wire $1.85 million to Fehrenbacher. (Dkt. 202 at 31.) Fehrenbacher transferred all of the funds Coexist deposited with him, $2 million total, to a Florida company by the name of Assured Capital, who was "the trader" referenced in the June 3 email. (Dkt. 202 at 44; Dkt. 203 at 46; Defs. Ex. 1 at 2.) In exchange for

3

having facilitated this transaction, Fehrenbacher requested as "compensation" use of a private jet to which Hubman had access. (Pl's. Ex. 17 at 5.)

On June 24, Fehrenbacher sent to Hubman via email two "Joint Venture Agreements." (Pl's Ex. 18.) One agreement concerned the $150,000 Coexist had transferred to Fehrenbacher and the other concerned the $1.85 million, but they are otherwise identical in their terms. (*Id.* at 6, 11.) The agreements provided that Fehrenbacher "desires to invest a portion of [Coexist's] principle [sic] on . . . a program" and that Coexist's funds would be placed "in escrow" where they would "remain under the control of the escrow agent at all times . . . to be used as proof of funds only." (*Id.* at 6, 11.) The agreements further provided that Fehrenbacher "acknowledges funds are not at risk." (*Id.*) The agreements then stated that "the investment will pay 30% per bi-weekly . . . thru December 2009." (*Id.*) Hubman asked Fehrenbacher via email if he wanted a copy of the Joint Venture Agreements with Hubman's original signature, or if a scanned version was sufficient. (*Id.* at 3.) Fehrenbacher replied, "you can bring them next week . . . you understand it. [A]nd its [sic] already in process. [S]o the papers is [sic] for the record." (Id. at 3.) Hubman testified that the agreements were signed at Fehrenbacher's office, but he never received fully executed copies. (Dkt. 202 at 48-49.)

After having transferred Coexist's money, as well as $2.8 million of his own funds, to Assured, Fehrenbacher discovered Assured was operating a Ponzi scheme. (Dkt 203 at 76, 83, 87.) Fehrenbacher complained to the FBI and testified before a grand jury against three of Assured's officers. (*Id.* at 87-88.) He also filed a civil suit against Assured and its officers and affiliates, obtaining a default judgment against one of the defendants and settling with others. (*Id.* at 89); (Defs. Ex. 1); *United Funding, Inc. v. Boschert*, No. 6:09-CV-1839-ORL-28, 2011 WL 6046930, at *2 (M.D. Fla. Nov. 14, 2011), *report and recommendation adopted,* No. 6:09-CV-1839-ORL-28, 2011 WL

6206071 (M.D. Fla. Dec. 6, 2011).[1] Assured eventually returned to Fehrenbacher approximately $4.3 million. (Dkt. 203 at 23.) Fehrenbacher then returned to Coexist $1,494,250.00. (Dkt. 202 at 103, 107, 115.) Fehrenbacher testified that the amount returned to Coexist was its pro-rata share of what was recovered from Assured, minus the costs incurred in obtaining the recovery. (Dkt. 203 at 92-93.)

Hubman testified that he did not know that the funds he deposited at Harris Bank would be transferred to the control of Assured, and did not learn that they were with Assured until October 2009. (Dkt. 202 at 43, 79.) When asked to explain how Hubman believed Coexist's money would remain safe in the Harris Bank account but also be traded, Hubman provided the following explanation: "Fehrenbacher made the representation to me that . . . he could put money under escrow and use it under an MT760, which is a block in the account and show it to people as the ability—show money. Like I know they can do it in real estate where they can go to an escrow. Someone else brings in the money to close the escrow, and then they take the money back and then make a fee for closing the escrow." (Dkt. 202 at 129.) Fehrenbacher asserts that Hubman knew his money would be transferred to Assured, and that Fehrenbacher explained the risk of such a transaction. (Dkt. 203 at 46, 70, 74, 78.)

The $1.85 million that Coexist transferred to Fehrenbacher had been given to Coexist by Shannon Stewart, a retired professional baseball player, via his father Harold Stewart, who managed Shannon's finances. (Dkt. 202 at 86; Dep. of Shannon Stewart at 5,8; Dep. of Harold Stewart at 5-6.) Hubman told the Stewarts that Coexist, Inc. was a charitable foundation and solicited a donation of $2 million, which Hubman explained would be a "conditional donation" that would be returned to the Stewart within a few months. (Dep. of Harold Stewart at 6, Dep. of Shannon Stewart at 8-9.) The money was never returned to the Stewarts and they subsequently filed suit. (Dep. of Shannon

---

[1] The Court may take judicial notice of proceedings in other courts related to the matter presently before it. *Opoka v. I.N.S.*, 94 F.3d 392, 394 (7th Cir. 1996).

5

Stewart at 7, Defs. Ex. 16.) In February 2012, the Stewarts obtained a stipulated judgment against Hubman and Coexist for $2 million. (Defs. Ex. 17.) As of the date of the trial in this action, Hubman had not paid any amount on the Stewart judgment. (Dkt. 202 at 95.)

**Discussion**

The following constitutes the Court's conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

1. Judgment in Favor of Coexist for Sale of Unregistered Securities

*Fehrenbacher's Liability*

Fehrenbacher's allegations in his civil suit against Assured constitute evidentiary admissions which, although not binding, the court may consider as evidence in this case. *Higgins v. Mississippi*, 217 F.3d 951, 955 (7th Cir. 2000). The allegation that the transaction with Assured was the sale of an unregistered security, unrebutted by the instant trial record, is sufficient for the Court to find that Assured's fraudulent scheme violated Fla. Stat. §517.07. Furthermore, under Florida law a person who "solicits the purchase of a security" and is "motivated at least in part by a desire to serve his own financial interests" constitutes a "seller" of a security. *Hilliard v. Black*, 125 F. Supp. 2d 1071, 1083 (N.D. Fla. 2000). The record provides sufficient evidence that Fehrenbacher, motivated at least in part by a desire to obtain compensation from Hubman in the form of access to a private jet, encouraged and facilitated Coexist's investment in Assured. By so doing, Fehrenbacher violated Florida securities law.

*Unclean Hands*

Fehrenbacher asks this Court to deny Coexist the remedy it seeks, rescission of the security purchase, under the doctrine of unclean hands. Under both Florida and Illinois law,[2] unclean hands is applicable only when the plaintiff's fraudulent conduct is directed at the party invoking the

---

[2] Fehrenbacher does not engage in a choice-of-law analysis in his motion for directed verdict or post-trial brief. The Court need not decide which state's law applies as the outcome is the same under both.

6

doctrine as a defense. *McCollem v. Chidnese*, 832 So. 2d 194, 196 (Fla. Dist. Ct. App. 2002); *Jaffe Commercial Fin. Co. v. Harris*, 119 Ill. App. 3d 136, 140 (1983). Fehrenbacher does not claim to be the victim of Hubman's alleged cons, but rather raises Hubman's deception of the Stewarts and others as a reason for denying Coexist relief. Although the Court is certainly suspicious of Hubman's integrity as the head of an alleged charitable foundation, it will not deny Coexist relief on that basis. "A court of equity is not an avenger of wrongs committed at large by those who resort to it for relief." *McCollem*, 832 So. 2d at 196. Furthermore, is no reason to believe money in Fehrenbacher's possession is more likely to make its way to the Stewarts than money in Coexist's coffers, from where the Stewarts at least have the possibility of recovering through an action to enforce the judgment they obtained.

The sale of unregistered securities is a strict liability offense. *Musolino v. Yeshiva Machzikei Hadas Belz*, 137 F. App'x 321, 323 (11th Cir. 2005). Therefore, whether Fehrenbacher was innocently parroting the information he was given by Assured or knowingly deceiving Hubman is not relevant to whether Hubman is entitled to a recovery. It is clear that Fehrenbacher had no business handling the investment finances of others. His representations to Coexist about their joint venture was riddled with telltale markers of a fraudulent investment scheme: promises that the scheme is both risk free and high-yield, vague references to a trading platform, use of escrow agents to receive and disburse funds, and false claims that the escrow account protects the investor from loss. *See, e.g*, U.S. Sec. and Exch. Comm'n, Investor Alert: "Prime Bank" Investments Are Scams, *available at* https://www.sec.gov/oiea/investor-alerts-bulletins/ia_primebankscam.html. It is therefore appropriate to undo the investment transaction with Coexist via the remedy of rescission.

*Damages Calculation*

Under the statute, the damages owed are the purchase price plus interest accruing since the date of purchase, less any income received from the investment. Fla. Stat. §517.211. The purchase price

7

of Coexist's investment was $2 million. Fehrenbacher eventually returned $1,494,250.00[3] of that $2 million. The outstanding purchase price owed is therefore $505,750.00. The interest on that amount to date is $189.521.40, bringing the total damages to $695,271.40. *See* Appendix 1.

2. Coexist's Failed Claims

*Breach of Contract*

To prevail on its breach of contract claims, Coexist must prove "1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 786 (7th Cir. 2015)(applying Illinois law).[4] Coexist asserts that the Escrow Disbursement Agreement attached as Exhibit A to his complaint and the Joint Venture Agreements found in Plaintiff's Exhibit 18 were valid contracts breached by Fehrenbacher. The Court finds however that Coexist has failed to prove that any of the three agreements constitute a valid and enforceable contract.

"Generally, a written contract . . . is not considered binding until it is executed by the parties involved." *Sterdjevich v. RMK Mgmt. Corp.*, 343 Ill. App. 3d 1, 14 (2003). "Nevertheless, a party named in a contract may, by his acts and conduct, indicate his assent to its terms and become bound by its provisions even though he has not signed it." *Carlton at the Lake, Inc. v. Barber*, 401 Ill. App. 3d 528, 531 (2010) (internal quotation omitted). Additionally, the terms of an agreement must be sufficiently definite and certain such that the meaning of the contract can be determined. "When material terms and conditions are not ascertainable, there is no enforceable contract, even if the intent to contract is present." *Wagner Excello Foods, Inc. v. Fearn Int'l, Inc.*, 235 Ill. App. 3d 224, 229-30 (1992). A contract "is sufficiently definite and certain to be enforceable if the court is enabled from the terms and

---

[3] Because interest begins to accrue at the time of purchase, Coexist would ordinarily be entitled to interest on this amount for the period of time it was invested with Assured. However, the record does not establish the dates of the return payments, and there is therefore no basis for calculating interest on this amount.

[4] Illinois law applies to the breach of contract claims because the Joint Venture Agreement contains a choice of law provision and because Illinois has the most significant contacts with the dealings between Fehrenbacher and Coexist.

8

provisions thereof . . . to ascertain what the parties have agreed to do." *Acad. Chicago Publishers v. Cheever*, 144 Ill. 2d 24, 29 (1991). Thus, to prove the validity of the alleged contracts, Coexist must prove that Fehrenbacher either signed the agreements or otherwise assented to their terms and that those terms are understandable enough to be enforceable.

The Escrow Disbursement Agreement ("Escrow Agreement") fails as a valid contract because there is insufficient evidence to prove that Fehrenbacher agreed to be bound by its terms in his dealings with Coexist. To begin with, there is no evidence from which to conclude that Fehrenbacher ever signed the Escrow Agreement. Furthermore, the record does not establish that Exhibit A to the complaint is related to the attachment on the March 16 emails or the reference to an escrow form in the March 31 email.

Even if the Court were to assume that the Escrow Agreement is the attachment on the March 16 emails, there is still insufficient evidence to find that the terms of the Escrow Agreement pertained to Fehrenbacher's dealings with Coexist. Fehrenbacher testified that the March 16 emails were regarding a possible loan to be issued to Chip Drury, and that position is somewhat supported by the content of the emails. If the Court were to find that the March 31 email referenced the Escrow Agreement, the lack of evidence about signing the agreement in Hubman's response to Fehrenbacher further supports the inference that no agreement was ever fully executed. In sum, the evidence presented is insufficient to prove that Fehrenbacher assented to the terms of the Escrow Agreement as a contract between Coexist and himself.

The primary problem with the Joint Venture Agreements is that they contain inconsistent terms which make it impossible to ascertain the meaning of the purported contracts. There is no such thing as a risk-free investment, and money cannot both remain in an escrow account (a temporary holding account) and produce astronomical, guaranteed profits. Even if the court were to find that Fehrenbacher intended for the agreements to be binding contracts, it is impossible to determine

9

whether the parties agreed to hold the money in escrow or invest it. Because there is no basis for deciding whether any agreement was kept or broken, there is no valid and enforceable contract. *See Acad. Chicago Publishers*, 144 Ill. 2d at 30.

*Civil Theft*

To establish a claim for civil theft, Coexist must show that Fehrenbacher knowingly obtained Coexist's property with the intent to, either temporarily or permanently, deprive Coexist of a right to the property or a benefit from the property, or appropriate the property for Fehrenbacher's own use or the use of any person not entitled to the use of the property. Fla. Stat. § 812.014(1). Additionally, Coexist must show that Fehrenbacher acted with "felonious intent." *Lewis v. Heartsong, Inc.*, 559 So. 2d 453, 454 (Fla. Dist. Ct. App. 1990). Coexist's claim fails for lack of evidence regarding Fehrenbacher's felonious intent. The record does not support a conclusion that Fehrenbacher took Coexist's money with the intent to wrongfully convert the funds for the benefit of someone other than Coexist. Fehrenbacher deposited his own funds alongside Coexist's with Assured Capital, and returned to Coexist a portion of what was recovered. Rather than demonstrating intent on the part of Fehrenbacher to steal from Coexist, the record reflects nothing more than a disagreement about how to allocate the loss suffered from the failed venture with Assured. Accordingly, Coexist's claim for civil theft fails.

*Securities Fraud*

To establish a claim under Fla. Stat. §517.301 for securities fraud, Coexist must prove that, in connection with a securities transaction, it justifiably relied on and was proximately harmed by a false representation or omission of material fact negligently made by Fehrenbacher. *First Union Disc. Brokerage Servs., Inc. v. Milos*, 997 F.2d 835, 844-45 (11th Cir. 1993). For the reasons discussed above regarding the lack of financial logic to the agreement between Coexist and Fehrenbacher, the Court

finds that Coexist's reliance on the promise that its funds were not at risk—in light of the promised returns and discussions regarding "trades"—was unreasonable and therefore unjustified.

*Florida Uniform Fraudulent Transfer Act ("FUFTA")*

A claim under FUFTA requires proof of (1) a defrauded creditor; (2) a debtor intending fraud; and (3) a conveyance of property which is applicable to the payment of the debt due. *Wiand v. Lee*, 753 F.3d 1194, 1199-200 (11th Cir. 2014). "A 'creditor' is 'a person who has a claim,' and 'claim' is broadly defined as 'a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.'" *Id.* (citing Fla. Stat. § 726.102(4),(3)).

When determining whether a transfer was made with intent to defraud a creditor, courts look to factors identified in the statute, often referred to as "badges of fraud." Therefore this court must consider whether

> (a) [t]he transfer or obligation was to an insider[;] (b) [t]he debtor retained possession or control of the property transferred after the transfer [;](c) [t]he transfer or obligation was disclosed or concealed[;] (d) [b]efore the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit[;] (e) [t]he transfer was of substantially all the debtor's assets[;] (f) [t]he debtor absconded [;] (g) [t]he debtor removed or concealed assets[;] (h) [t]he value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred[;] (i) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (j) [t]he transfer occurred shortly before or shortly after a substantial debt was incurred; [or] (k) [t]he debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Fla. Stat. § 726.105. Here, Coexist has only provided evidence relevant to one factor, i.e., evidence that the transfer was concealed. Similar to the civil theft claim discussed above, this claim fails for lack of proof demonstrating the requisite intent. The evidence does not support finding that Fehrenbacher transferred Coexist's money to Assured with the intent of impeding Coexist from accessing money that Fehrenbacher knew it would or might someday owe to Coexist.

11

**Conclusion**

The Court finds in favor of Coexist for the sale unregistered securities in violation of Fla. Stat. § 517.07. Pursuant to Fla. Stat. §517.211, the Court holds defendants jointly and severally liable in the amount of $694,271.40 plus interest accruing. Coexist failed to prove its prima facie case on its claims for breach of contract, civil theft, security fraud, and fraudulent transfer. The Court therefore grants the motion for directed verdict on these claims.

    IT IS SO ORDERED.

                                            SHARON JOHNSON COLEMAN
                                            United States District Judge

DATED:  August 2, 2016

Appendix 1: Statutory Damages Under Fla. Stat. §517.211

| Time period | Interest amount | Interest rate per annum* | Principal | Grand Total |
|---|---:|---:|---:|---:|
| 2009(Jul-Dec) | $20,230.00 | 8% | | |
| 2010 | $30,345.00 | 6% | | |
| 2011(Jan-Sep) | $22,758.75 | 6% | | |
| 2011(Oct-Dec)** | $6,005.78 | 4.75% | | |
| 2012 | $24,023.13 | 4.75% | | |
| 2013 | $24,023.13 | 4.75% | | |
| 2014 | $24,023.13 | 4.75% | | |
| 2015 | $24,023.13 | 4.75% | | |
| 2016-Q1 | $6,005.78 | 4.75% | | |
| 2016-Q2 | $6,043.71 | 4.78% | | |
| 2017-Q3 (July only) | $2,039.86 | 4.84% | | |
| | | | | |
| TOTAL | $189,521.40 | | $505,750.00 | $695,271.40 |
| ** interest rate changed mid-year due to change in law. *See* Chapter 2011-169, Laws of Florida. | | *available at http://www.myfloridacfo.com/division/aa/vendors/ | | |